JAMES R. DREDGE, Appellant, *v.* THE STATE OF NEVADA, ex rel., ITS DEPARTMENT OF PRISONS, Respondent.

No. 18465

February 22, 1989                    769 P.2d 56

*Norah Ann McCoy,* State of Nevada Employees Association, Carson City, for Appellant.

*Brian McKay,* Attorney General, *Debra Winne Jeppson,* Deputy Attorney General, Carson City, for Respondent.

# OPINION

By the Court, STEFFEN, J.:

James R. Dredge, a correctional sergeant employed by the Nevada Department of Prisons (NDOP), was terminated for misconduct involving off-duty driving under the influence of alcohol and associating with an ex-inmate. The former conduct resulted in Dredge's arrest. Although Dredge was reinstated after a hearing conducted by a Nevada Personnel Commission hearing officer, the district court reversed the hearing officer's decision, thus prompting this appeal. We affirm.

## The Facts

Prior to his discharge on July 21, 1986, Dredge had been employed at the Northern Nevada Correctional Center (NNCC) for approximately six years. His employment history was that of a valued employee whose last two evaluations before his termination reflected an "above average" rating.

On May 31, 1986, Dredge was off duty and drinking at a bar when he saw and greeted John Paul Ellis, an ex-inmate from NNCC. The two men engaged in sporadic conversation before Ellis prevailed upon Dredge to give him a ride to a girlfriend's house. Enroute to the intended destination, Dredge tailgated another vehicle, thus provoking the driver to record Dredge's license plate number and contact a Nevada highway patrolman.

Officer Benzler was directed to the Dredge vehicle by the concerned citizen. The officer, smelling "a strong odor of intoxicating beverages" on Dredge, directed him to take a field sobriety test. Based upon Dredge's driving, odor of alcohol, failure to pass the sobriety test, and loud and boisterous behavior, Officer Benzler arrested him.

After arresting Dredge, and while taking a statement from the percipient witness, the officer was forced to arrest Ellis for attempting to interfere in the officer's duties. Later, at the sheriff's office, Dredge twice refused to submit to a breath or chemical test as required by Nevada's implied consent law. According to Officer Benzler, Dredge refused to take either test without having an attorney present. Dredge's recalcitrance was consistent with the advice given him by Ellis. Ultimately, Dredge agreed to a breath test after being informed that his refusal to cooperate would result in the loss of his driver's permit for a year, during which he would be unable to work because NDOP's regulations required that prison employees be qualified to drive. Dredge's breath tests revealed alcohol levels of .20 percent and .19 percent.

Dredge later supplied bail for both himself and Ellis by placing a second mortgage on his house and co-signing Ellis' bail agreement. Upon their release, the bail bondsman, Larry Ogden, drove the two men to Dredge's truck, where he left them.

On June 20, 1986, Dredge pleaded guilty to driving under the influence and served one day in jail. His driver's license initially was revoked for ninety days and later reduced to a total of forty-seven days. As previously observed, Dredge was discharged on July 21, 1986. In general, his termination from state service resulted from "disgraceful" conduct related to the DUI and his behavior associated therewith, and having an ex-inmate in his company contrary to regulations, thereby compromising his position as a peace officer.

The hearing officer viewed the evidence in a more benevolent light than George Sumner, the Director of the Nevada Department of Prisons, who made the decision to terminate Dredge. In addition, the hearing officer incorrectly applied our holding in Schall v. State, 94 Nev. 660, 587 P.2d 1311 (1978), to exclude from his decision evidence surrounding the extent of Dredge's association with Ellis during the overall period of behavior considered by the Director in his decision to terminate. The district court granted relief under NDOP's petition for judicial review. The court held that the hearing officer, erroneously interpreting *Schall,* labored under an error of law in refusing to consider evidence that, although admitted, was not included in the specificity of charges. The district court concluded that the evidence thus excluded from the decisional process was substantial because it supported the State's position that Dredge associated with an ex-inmate without authorization. We agree with the district court.

## Discussion

It was the task of the hearing officer to determine whether NDOP's decision to terminate Dredge was based upon evidence that would enable NDOP to conclude that the good of the public service would be served by Dredge's dismissal. *See* NRS 284.385(1)(a); 284.390(5); Oliver v. Spitz, 76 Nev. 5, 348 P.2d 158 (1960). Moreover, the critical need to maintain a high level of security within the prison system entitles the appointing authority's decision to deference by the hearing officer whenever security concerns are implicated in an employee's termination. *See* NAC 284.650(3).[1]

----

[1]NAC 284.650(3) provides as follows:

284.650  Causes for disciplinary action.  Appropriate disciplinary or corrective action may be taken for any of the following causes:

The standard of review by which we evaluate the hearing officer's decision is governed by the Administrative Procedure Act, NRS 233B. Specifically, under NRS 233B.140(5), the courts are enjoined from substituting their judgment for that of the agency concerning the weight of the evidence on questions of fact. Stated otherwise, both the district court and this court are constrained to review the record as it existed before the administrative agency to determine whether the agency abused its discretion by acting arbitrarily or capriciously. Gandy v. State ex rel. Div. Investigation, 96 Nev. 281, 282, 607 P.2d 581, 582 (1980). Courts are empowered to reverse or modify an agency's decision if the aggrieved party has been prejudiced by administrative findings, inferences, conclusions or decisions that are, *inter alia,* affected by error of law, clear error in view of the reliable, probative, and substantial evidence of record or an abuse or clearly unwarranted exercise of discretion. NRS 233B.140(5)(d)(e) and (f).

As noted previously, the district court concluded that the hearing officer excluded substantial evidence from the decisional process because of an erroneous interpretation of this court's decision in *Schall.* We reversed the district court in *Schall* because the judge, perceiving no evidential support for the finding upon which the hearing officer sustained the termination of Dr. Schall, nevertheless affirmed the decision on a ground that had never been charged against Schall. Such is not the case here. Dredge was specifically charged with unauthorized association with an ex-inmate. Details in support of the charge that were presented at the hearing but not included within the specification of charges were not properly excluded under *Schall.* We therefore agree with the district court that the hearing officer erroneously failed to consider substantive evidence in reaching his decision.[2]

---

. . . .
3. The employee of any institution administering a security program, in the considered judgment of the appointing authority, violates or endangers the security of the institution.

[2]The record, excluding the findings of fact, conclusions of law and decision, is equivocal on whether the hearing officer considered the evidence referred to in the text as being excluded from his decision. At one point, the hearing officer said if the evidence was not specified in the NPD-41 (the charging document), "it's not charged and it's not going to be considered." Later, however, he said "I'll take it into my consideration, yes, but it's not properly set forth in the NPD-41." The uncertainty was ultimately resolved, however, by the formal findings issued by the hearing officer. Citing *Schall,* the hearing officer found that "these allegations [the additional evidence concerning the unauthorized association charge] cannot be considered as a basis for the discipline."

Moreover, rather than extending deference to the appointing authority's determination to terminate Dredge for reasons involving prison security, the hearing officer engaged in an unwarranted exercise in semantics concerning the meaning of the term "association." Resorting to dictionary definitions, the hearing officer concluded that "an isolated, limited contact with an ex-inmate does not fall within the ambit of 'association.'"

Whatever connotation is placed on the word "association," it is clear from the evidence that Director Sumner had ample basis for concluding that Dredge's experience with the ex-inmate exceeded rational parameters of incidental contact to such an extent that a determination of unauthorized association was reasonably warranted. After Dredge recognized and greeted Ellis at a bar, their intermittent conversations expanded to the point where Dredge gave Ellis a ride that culminated in the arrest of both men. Thereafter, the record reflects a relationship characterized by Dredge placing a second trust deed on his house and co-signing the bail agreement to facilitate the ex-inmate's release from jail. These and other activities not described here, constitute a compelling basis for the conclusion that Dredge had engaged in an unauthorized association with an ex-inmate. Understandably, the Director felt that Dredge's behavior compromised the security of the prison system and set an unacceptable and deleterious standard of conduct for prison supervisory personnel.

In a further attempt to buttress his conclusion that Dredge did not meaningfully associate with an ex-inmate, the hearing officer speculated that Dredge was "grossly inebriated" and in a "drunken stupor," thereby rendering himself incapable of "the requisite mens rea to intend to associate" with the ex-inmate. Even if we were to accept, arguendo, the dubious premise that a guilty mind is a requisite to the right to terminate for unauthorized association with an ex-inmate, the record belies the hearing officer's finding. Indeed, the hearing officer concluded somewhat anomalously, that there was not credible evidence that Dredge was following anyone's dictates other than his own mind when he refused to submit to the breathalyzer test. Dredge himself explained that he heard discussion concerning the effect of a thunderstorm on the accuracy of the breathalyzer machine. Moreover, Dredge had presence of mind to complete necessary documentation to secure his release and that of the ex-inmate. He also indicated that he would not have considered himself "drunk" at the time of his release. In short, we are satisfied that the appointing authority attached a practical and reasonable meaning to the term "association" and supplied abundant evidence to support

the decision to terminate Dredge. The hearing officer therefore either abused his discretion or, at a minimum, exercised a clearly unwarranted discretion.

In view of the foregoing, it is unnecessary to address the issue arising from the hearing officer's conclusion that the appointing authority's determination that Dredge had engaged in disgraceful conduct is unproved. We observe in passing, however, that we again find ample evidence in the record to support the Director's position.

Finally, based upon the foregoing, and our thorough review of the record, we reiterate that we are satisfied that the hearing officer erroneously interpreted *Schall,* thereby excluding from his decision substantial evidence of unauthorized association, and secondly, the record reflects that the hearing officer's decision to reverse Dredge's termination by the appointing authority was clear error in view of the reliable, probative, and substantial evidence of record.

The judgment of the district court is affirmed.[3]

YOUNG, C. J., and MOWBRAY, J., concur.

SPRINGER, J., dissenting:

I dissent because this case represents an excellent example of when the judicial branch of government should keep its nose out of administrative affairs. In compliance with the statutory scheme a Nevada Personnel Hearing Officer, after a full-day hearing, involving ten witnesses and the introduction of numerous exhibits, ruled that Dredge's actions did not warrant his permanent dismissal from state civil service. Now, for reasons far from satisfactory, this court intrudes into the prescribed scheme of things and destroys this man's career. I disapprove.

The first excuse employed by the majority for disrupting the administrative machinery is that "the hearing officer excluded substantial evidence from the decisional process." It is true that at first the hearing officer was reluctant to hear the rather ridiculous charge that Dredge was a security risk because "it's not charged"; but, still, as admitted in the majority opinion, the hearing officer later said that he would take it into consideration. What more do they want? The majority opinion states that the hearing officer's ruling is "equivocal." Even if it were, the supposed equivocation should be resolved in favor of the hearing officer, who, after all, said that he considered these matters in making a decision.

Had the hearing officer actually refused to consider certain evidence of Dredge's supposed association with Ellis, we might

---

[3]THE HONORABLE ROBERT E. ROSE, Justice, did not participate in the decision of this appeal.

be inclined to agree with the district court's conclusion. This is not the case, however. Not only is it undisputed that testimony relating to the contact was admitted into evidence, the transcript of the hearing clearly indicates that the hearing officer considered this matter. Expressing his concern that Dredge had not received adequate notice of the evidence to be presented against him, the hearing officer stated, "I said it's been in and we've beat it to death ad nauseam. *I'll take it into my consideration,* yes, but it's not properly set forth in the NPD-41." (Emphasis supplied.) As no other cognizable error of law manifests itself in the record, the district court lacked authority to set aside the hearing officer's decision on the basis of its being unfounded as a matter of law.

On this question of Dredge's supposed breach of prison security by association with ex-convicts, it appears to me that the charge was an afterthought and a "hook" on which to base additional, previously unthought-of charges. No one seriously contends that Dredge fraternizes with former prisoners or is in any way a threat to prison security. This was a very isolated event; Dredge was drinking and did strike up a conversation with a former convict with whom he had become acquainted at the prison. The rest followed from Dredge's unfortunate willingness to do a favor for the man.

Expressing concern that the NDOP's "'association' regulations are ambiguous and incomplete as to what is incidental 'contact' and impermissible 'association,'" the hearing officer noted that Webster's Dictionary defines "association" as "the act of joining in the company of another and [connotes] that the joining be as a partner, companion or similar intimate, on-going relationship." Based on this definition, the hearing officer concluded that "[c]ertainly, an isolated, limited contact with an ex-inmate does not fall within the ambit of 'association.'" *Cf.* Arcinieaga v. Freeman, 404 U.S. 4 (1971); State v. Morales, 668 P.2d 910 (Ariz.App. 1983). Given the substantial evidence of the unplanned and incidental nature of the particular contact in question, and the complete lack of any evidence of an ongoing relationship of any kind between the two men, I believe that the hearing officer's decision is entirely consistent with the record.[1] Also arguing strongly against the conclusion that Dredge's contact with Ellis compromised Dredge's effectiveness as an employee at NNCC is the undisputed evidence that Dredge worked for eight months without incident following his reinstatement.

---

[1]Much is made of the fact that Dredge paid Ellis's bail, but this act is easy to understand. Dredge thought (at the time) that Ellis had loyally taken his side in the matter and felt obligated to get Ellis out of jail. It is difficult to imagine how such a one-sided and spontaneous act of ordinary humanity is in any sense an "association" prohibited by prison regulations.

The majority says that it is "unnecessary to address the issue arising from the hearing officer's conclusion that the appointing authority's determination that Dredge had engaged in disgraceful conduct is unproved." They then go on to consider the issue. If they really mean that they did not consider this part of the charge, then the opinion has absolutely no substance, because a permanent employee with a good record like Dredge's obviously should not be permanently terminated on the "association" charge alone—a single afternoon's encounter with an ex-convict. On the other hand, if they did consider the drunken driving episode, which I suspect they did, then I too must consider it.

The hearing officer did not believe that Dredge's alleged uncooperative conduct at the time of his arrest was sufficiently "disgraceful" to justify the complete termination of Dredge's civil service appointment. While Dredge arguably exercised bad judgment in pleading with the arresting officer and initially refusing to take a blood-alcohol test, such behavior is easily understandable: Dredge feared that his driving privileges would be revoked and that he would be suspended without pay for the duration of the revocation. As stated earlier, whether Dredge refused to take the blood-alcohol test on Ellis's advice is unclear from the record. The arresting officer testified that he believed Dredge was following Ellis's advice in refusing to take the test; however, Dredge testified that he refused to take the test because he had overheard other police officers discussing the fact that the "breathalyzer" had been giving inaccurate readings all day. The arresting officer confirmed that the "breathalyzer" appeared to malfunction after tests were begun on Dredge. Finally, I would point out that the arresting officer testified that Dredge at one point attempted to restrain Ellis from interfering with the course of Dredge's arrest. Such conduct can hardly be described as "disgraceful." The hearing officer's favorable conclusion with respect to the charge of "uncooperativeness" was not clearly erroneous.

The state concedes that it is the prison's position that none of these charges alone would support Dredge's permanent termination. This being the case, the majority's basing its opinion on the so-called "association" charge alone is contrary to the NDOP's concession that one charge alone does not warrant dismissal.

The hearing officer took into consideration the aggregate of charges and held that the proofs did not justify permanent termination of an employee with Dredge's good record. I believe the hearing officer's decision should stand.

The reason for Nevada's administrative personnel structure, which allows charged employees to have a hearing before an impartial hearing officer instead of before some agent of his state employer, is to give some insulation and objectivity to the contested hearing process. The majority opinion is an intrusion into

the procedures which effectuate this sound personnel policy. The majority appears to object to the· hearing officer's "view[ing] the evidence in a more benevolent light than George Sumner, the Director of the Nevada Department of prisons, who made the decision to terminate Dredge." Taking a new and impartial view of the evidence is exactly what personnel hearing officers are supposed to do. I see this court as siding with the appointing authority and setting aside a clearly justifiable decision of an administrative officer. There is no reason that I can discern for this kind of unwarranted intrusion into the administrative process by either the district court or by this court; so I dissent.